UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEN ADAMS, on behalf of himself, all others similarly situated, and the general public,<br><br>        Plaintiff,<br><br>   v.<br><br>MEDICAL STAFFING NETWORK HEALTHCARE, LLC; DOES 2-50, inclusive,<br><br>        Defendants. | No. 2:13-cv-00921-GEB-AC<br><br>**ORDER GRANTING REMAND MOTION** |

      Plaintiff seeks an order remanding this putative class action to the state court from which it was removed, arguing that removal jurisdiction asserted under the Class Action Fairness Act of 2005 ("CAFA") does not exist since Defendant has not shown that CAFA's $5 million amount-in-controversy requirement is satisfied. (Pl.'s Mot. to Remand ("Pl.'s Mot.") 1:6-9, ECF No. 10.) Defendant counters that it has "presented concrete evidence demonstrating . . . that the amount in controversy . . . exceeds $7.9 million." (Def.'s Opp'n to Mot. to Remand ("Def.'s Opp'n") 1:3-5, ECF No. 14.)

## I. BACKGROUND

      Plaintiff alleges in his First Amended Complaint ("FAC") the following claims under California law: 1) failure to provide meal and rest periods, 2) failure to provide accurate

1

written wage statements, 3) failure to timely pay all final wages, and 4) unfair competition. (FAC, Not. of Removal Ex. C, ECF No. 4-3.) Plaintiff defines the class in the FAC as Plaintiff "and all other similarly situated health care professionals whose tax home is in California and/or worked in the State of California for Defendant[], during the relevant time period [] defined as . . . beginning from July 2, 2010, until judgment is entered." (Id. 3:13-16.)

Defendant asserts in its Notice of Removal that the amount in controversy is $7.9 million, based on the following calculations concerning each claim and attorneys' fees:

> Claim 1. Failure to provide meal and rest periods - $3.88 million
>
> Claim 2. Failure to provide accurate written wage statements - $.97 million
>
> Claim 3. Failure to timely pay all final wages - $1.48 million
>
> Attorneys' Fees - $1.58 million (calculated as 25% of the above damages)

(Not. of Removal ¶¶ 28, 32, 37, 40, 41 ECF No. 2.)

## II. LEGAL STANDARD

"Federal jurisdiction under CAFA has three elements: (1) there must be minimal diversity of citizenship between the parties, (2) the proposed class must have at least 100 members and (3) the amount in controversy must exceed[] the sum or value of $5,000,000." Kuxhausen v. BMW Fin. Servs. NA LLC, 707 F.3d 1136, 1139 (9th Cir. 2013) (internal quotation marks omitted). "[T]he burden of establishing [CAFA] removal jurisdiction [is] on the proponent of federal jurisdiction." Abrego Abrego v. Dow

2

1  Chem. Co., 443 F.3d 676, 685 (9th Cir. 2006) (per curiam). "A
2  defendant seeking removal of a putative class action [under CAFA]
3  must demonstrate, by a preponderance of evidence, that the
4  aggregate amount in controversy exceeds the jurisdictional
5  minimum." Rodriguez v. AT&T Mobility Servs., 728 F.3d 975, 981
6  (9th Cir. 2013). However, "[c]onclusory allegations as to the
7  amount in controversy are insufficient" to establish the
8  jurisdictional amount. Matheson v. Progressive Specialty Ins.
9  Co., 319 F.3d 1089, 1090-91 (9th Cir. 2003). Rather, under the
10 preponderance-of-the-evidence standard, the removing "defendant
11 must provide evidence establishing that it is 'more likely than
12 not' that the amount in controversy exceeds [the jurisdictional]
13 amount" of $5,000,000. Sanchez v. Monumental Life Ins. Co., 102
14 F.3d 398, 404 (9th Cir. 1996).

### III. DISCUSSION

16          Defendant relies on information from Rochelle Flint, a
17 generalist in Defendant's human resources department, as support
18 for its contention that the amount in controversy exceeds the
19 $5,000,000 sum or value. (Decl. of Rochelle Flint in Supp. of
20 Def.'s Not. of Removal ("Flint Decl.") ¶ 1, ECF No. 3.) Ms. Flint
21 declares she "reviewed referral and placement records" for
22 Defendant's healthcare professionals and found that Defendant
23 referred "1,068 California-based healthcare professionals" to
24 staffing sites "between September 28, 2010 and April 22, 2013."
25 (Id. ¶¶ 6, 8.) Ms. Flint avers that during this period, these
26 healthcare professionals worked a total of approximately 78,905
27 work-shifts of such length that employees would be entitled to at
28 least one meal and one rest period under California law. (Id.

¶ 11.) She avers that "[t]o calculate an approximate and conservative average rate of pay" for these employees, she "reviewed available pay records" for four of its five California staffing agency branches for the month of October 2011 to arrive at an average rate of pay of $24.59 per hour for each referenced employee. (Id. ¶ 12.)

Defendant argues Ms. Flint's information evinces that the amount in controversy exceeds $7.9 million. (Not. of Removal ¶ 41.) The largest portion of this amount-in-controversy figure is Defendant's estimate of Plaintiff's meal and rest period claims, totaling $3.9 million. (Id. ¶ 28.) Under California law, "[i]f an employer fails to provide an employee a meal or rest period . . ., the employer" is required to "pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." Cal. Lab. Code § 226.7(b). Employees "may recover up to two additional hours of pay on a single work day for meal period and rest period violations—one for failure to provide a meal period and another for failure to provide a rest period." United Parcel Serv., Inc. v. Sup. Ct., 196 Cal. App. 4th 57, 70 (2011).

Defendant arrived at the $3.9-million figure by assuming a 100% violation rate; Defendant assumed that each class member was deprived of one meal period and one rest period per shift worked. Defendant calculated its $3.9-million figure as follows:

> Meal Periods: 78,905 shifts x 1 missed meal period/shift x $24.59/hour = $1,940,274

4

    Rest Periods: 78,905 shifts x 1 missed rest period/shift x $24.59/hour = $1,940,274

    Total: $3,880,548.[1]

(Not. of Removal ¶ 28.)

  Plaintiff counters that this calculation and figure is improperly based on "speculation." (Pl.'s Mot. 7:4.) Specifically, Plaintiff contends Defendant's $24.59 average hourly rate of pay and 100% violation rate are both flawed and cannot support removal jurisdiction. (Id. 7:19-12:23.)

  Plaintiff argues the $24.59 average hourly rate of pay is unreliable because "[i]nstead of analyzing available data for the *entirety of the class period* for all branches in California, Defendant merely reviewed records for a *one month* period for select branches from the class." (Id. 9:2-4.) Defendant does not explain why it made its hourly wage estimate based only on a review of four of its five California branches. (See Flint Decl. ¶ 12.) Nor has Defendant offered an explanation for why it relied on an average instead of using actual, individual wage data from its records. Further, Defendant admits hourly wages "can vary from client to client, branch to branch, and year to year," yet does not explain why it concludes that the average hourly wage it calculated for October 2011 is indicative of an average hourly wage for the entire class period. (Def.'s Opp'n 4:7.) Therefore, even assuming inclusion of data from the excluded fifth branch would not change the average wage figure Defendant calculated for October 2011, Defendant has not demonstrated that the October 2011 figure is a reliable average wage for class members during

---

[1] This figure is rounded upward and is hereinafter referenced as $3.9 million.

the class period.

Plaintiff also argues that Defendant's use of 100% violation rates for the meal and rest period claims is improper because "Plaintiff does not contend that every single employee of Defendant in California missed every single meal period," nor "that he and the class were *never* authorized or permitted to take *any* rest breaks at all." (Pl.'s Mot. 10:2-3, 12:11-12.) Plaintiff asserts he "only seeks to represent those individuals who suffered a violation of the law—not every single employee for every shift they worked." (Id. 12:12-14.)

Defendant rejoins that the 100% violation rates "are not assumptions at all, but instead allegations in Plaintiff['s] FAC that are assumed true for purposes of removal." (Def.'s Opp'n 15:17-18.) Defendant cites to the introduction of the FAC where Plaintiff alleges that Defendant "fail[ed] to provide [the class] with <u>all</u> required meal and rest periods." (FAC 2:3-4 (emphasis added).) The word "all" in this sentence of the FAC suggests Plaintiff alleges Defendant provided class members some but not "<u>all</u> required meal and rest periods." (Id. (emphasis added).) However, Defendant interprets the word "all" to mean "any"; i.e., Defendant failed to provide the class with <u>any</u> required meal and rest periods.

Additional allegations in the FAC support Plaintiff's position that the word "all" should not be interpreted to mean "any." Plaintiff's FAC defines meal period classes as "[a]ll employees who worked a shift" in excess of a certain number of hours "who either: a) Did not take their meal break" or "b) Were not provided their . . . uninterrupted 30 minute meal break."

6

(FAC 3:22-4:2.) Plaintiff's FAC defines the rest break similarly with the description "[a]ll employee[s] who." (Id. 2:3.) The FAC uses the word "all" in the phrase "all employees who" as an open-ended description of an indefinite, potential number of violations. Therefore, Defendant has not shown allegations in the FAC support its 100% violation rates.

Moreover, Defendant cannot, as it has done in the motion sub judice, "assume[] that each employee would be entitled to the maximum statutory penalty" without providing "evidence supporting that assertion." Garibay v. Archstone Communities LLC, No. 13-56151, 2013 WL 4517934, at *1 (9th Cir. Aug. 27, 2013); see also Helmerich & Payne Int'l Drilling Co., 2013 WL 5274283 at *6 (holding that because the defendant failed "to provide any facts supporting the calculations based upon 100% violations, [d]efendant has failed to carry the burden to demonstrate by a preponderance of the evidence that the amount of damages in controversy exceeds $5,000,000"); Kogok v. T-Mobile USA, Inc., No. 13-cv-838 BEN (BLM), 2013 WL 5679021, at *5 (S.D. Cal. Oct. 15, 2013) ("[Defendant] has not presented any evidence that [a 100% violation rate] is an accurate assumption, nor does such an allegation appear in the FAC. Accordingly, [defendant] has not established by a preponderance of the evidence that over $5 million is in controversy . . . .").

In sum, Defendant "rel[ies] on speculative and self-serving assumptions about key unknown variables," which are "insufficient to support removal jurisdiction under CAFA" Garibay, 2013 WL 4517934 at *1. Defendant has provided nothing more than conclusory explanations to support its $3.9 million

figure for meal and rest period monetary claims argued to support the amount-in-controversy requirement. Removing Defendant's conclusory estimate of meal and rest period penalties and accompanying attorneys' fees, which Defendant assumes are recovered at 25%, the amount in controversy is reduced from Defendant's asserted $7.9 million figure to $3.02 million.[2] Since Defendant's asserted estimate of meal and rest period penalties was so inflated, Defendant's estimates for the wage statement and waiting time claims need not be addressed to determine that Defendant has not shown by a preponderance of the evidence that the amount in controversy exceeds $5 million.[3]

Lastly, Defendant notes in its Opposition that should it be concluded "that the exercise of federal jurisdiction is [not] proper," it "requests that the Court allow the parties to engage in limited discovery regarding the amount in controversy." (Def.'s Opp'n 17 n.16.) District courts have discretion to authorize jurisdictional discovery, but Defendant has not indicated what materials it would seek in discovery. Further,

---

[2] $7.9 million - $3.9 million [meal and rest period penalties] – 25% x $3.9 million [attorneys' fees] = $3.02 million

[3] For example, assuming Defendant's average hourly rate of pay of $24.59 is correct and a lower violation rate than what Defendant asserts should be used of one violation per week (or 20%, assuming five shifts per week), then the estimated meal and rest period damage figure would be reduced to $.78 million (20% x $3.88 million = $.78 million). See Tripp v. Crossmark, Inc., No. 13-cv-03480-WHO, 2013 U.S. Dist. LEXIS 144154, at *5 n.2 (N.D. Cal. Oct. 3, 2013) (compiling authorities holding that "where plaintiffs[] allege a practice and policy of denying meal and rest periods, defendants can reasonably base their amount in controversy calculation on an estimate that each class member missed one meal and rest break per" week). Assuming Defendant's other damage estimates are accurate, even assuming arguendo that use of the 100% violation rate for wage statement and waiting time claims is accurate, then estimated damages before adding attorneys' fees would be $3.23 million ($.78 million [meal and rest period claims] + $.97 million [wage statement claim] + $1.48 million [waiting time claim] = $3.23 million). Adding attorneys' fees at Defendant's assumed rate of 25% of total recovery, the total amount in controversy would be $4.04 million ($3.23 million [total recovery] x 125% = $4.04 million).

averments in Ms. Flint's declaration suggest that Defendant is already in possession of records detailing each employee's hourly wage for each work shift during the class period. (See Flint Decl.) Therefore, "[a]llowing for judicial discovery would be an unnecessary delay" because it appears Defendant has not shown it does not have "the records necessary to show whether the amount in controversy is met." <u>Trang v. Turbine Engine Components Techs. Corp.</u>, No. 12-cv-07658-DDP-RZx, 2012 WL 6618854, at *7 (C.D. Cal. Dec. 19, 2012).

Accordingly, Defendant's noted request for jurisdictional discovery is denied.

## IV. CONCLUSION

For the stated reasons, Plaintiff's motion to remand is GRANTED. This case is remanded to the Superior Court of the State of California in the County of Sacramento, from which it was removed.

Dated: December 5, 2013

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

9